Locke, District Judge,
after stating the facts, delivered the opinion of the court:
There are but few questions of fact in this case and none of law; the relative positions of the vessels previous to the collision and their movements determining the rights of either the one or the other of the parties. Unquestionably, in cases of inevitable or unavoidable accident by collision or otherwise, the damage and loss must rest where it falls. In ordinary cases it is a well-known rule that steam vessels must give way and look out for sailing vessels, and the presumption in cases of collision between such vessels is that the steamer is in fault, but such presumption may be overcome by evidence of the circumstances of the individual case showing that such is not the fact. One question upon which there has been much conflicting testimony, and which is deemed of considerable importance in the case, is as to where, at the entrance of the canal, the channel was located,—whether in the middle, as alleged by libelant, or along the northerly and westerly side, as is urged by claimants. The term “channel” is properly applied to the portion of the bed of a river or canal which furnishes uninterruptedly through its course the deepest water, and the fact that the steamer Sarah, drawing eight inches more of water than the schooner, was able to get in alongside of the piling on the side at all, while the schooner, while lying with her stern in about the middle of the canal, and her bow towards the Sarah, was aground as to her stern, but afloat as to bow, shows conclusively that at that time, at least, the greatest depth of water was on the side where the steamer was lying, and that must be accepted as the channel, and it be considered that the steamer was properly in it.
Upon the arrival of the schooner Clarke at the mouth of the canal on Wednesday evening, her crew consisted of the master, one seaman, and a boy. The master came into the city, and had not returned at the time of the collision, leaving the one seaman and the hoy the only ones on board to bring the schooner in,—an insufficient crew for a vessel of her size, and particularly so, considering the crowded condition of the canal. It also appears that at the commencement of the collision, when the steamer Louisiana desired to take a line to tow her out of danger, they had to unreave one of the halliards to use as a tow line, which, being *236 of insufficient strength, failed to accomplish what would otherwise probably have saved her. The schooner, therefore, seems to have been insufficiently furnished with both crew and lines.
According to the uncontradicted testimony of libelant’s witnesses, just before the collision occurred the steamer Sarah, which arrived first, was in the deepest water alongside the piling. The Leander Jane, drawing a little less water, had managed to pull in by the steamer’s bows, and had gone on her way into the canal; and the schooner Clarke was lying alongside the Sarah, with her stern about 10 feet forward of the Sarah’s stern, and her bow consequently about 20 feet abaft of the Sarah’s bows, made fast with head and stern lines, the latter fast on board the Sarah. How the head lines were made fast does not appear; they had had one line made fast to the Leander Jane, but this was cast off when she got under way. From this point the testimony becomes conflicting. Fred Heidenstrom, in charge of the Clarke, in his testimony says that they had two lines ashore, one from the head and one from the stern; one line ashore on the steamboat Sarah; and they had to turn their stern line loose, “being that the Sarah wanted to come in, and that threw us across the channel alongside the Sarah, and the Sarah pushed ahead and struck our bowsprit and kept on breaking it.” He says that she broke the stem open, broke the knighthead and a few stanchions, and raised the plank-sheer off, so that she began to leak. William Bellais, the boy on board, says that the Clarke’s bowsprit struck the end of the lumber pile forward; that the Sarah struck the Clarke by steaming ahead; that the Clarke’s stern was aground, but her bow was afloat; that the Sarah hit her a couple of times by steaming ahead.
These are the only witnesses who claim to have seen the collision, and say that it was done by the Sarah running into or against the Clarke. On the other hand, the testimony of the master, the engineer, and two seamen of the Sarah; Dyes, master of the schooner Pippo; Boyd, master of the schooner Laura L.; George Long, a witness standing on the platform at the Southern Yacht Club House, but a few yards distant from the place of collision, as well as the statement of Heidenstrom himself, in regard to the position of his vessel prior to the collision,—satisfies us, by an overwhelming preponderance, that the Sarah was holding onto the piling by lines; that she was so hard aground that she was unable to change her position with any degree of rapidity, if at all; that the schooner was never ahead of, nor up even with, the steamer; and that the damage was done by casting off the stem line of the schooner,—thus permitting the stern to be driven around by the wind and sea, bringing the bowsprit and stem against the broadside of the lumber piled upon the steamer’s deck.
We do not consider it material whether or not the steamer may have been pushing along slowly forward into the canal either by force of the wind and sea, by heaving on lines, or even by her steam power, as her bow was at all times ahead of the bow of the schooner, and what slight motion she appears to have had could in no way have changed the final result. We are satisfied the damage was done by the schooner beating *237 herself against the steamer by the force of the wind and sea, rather than by any movement of the steamer. We do not find that there was any action on the part of those in charge of the steamer that resulted in the injury to the schooner, or that they could possibly have done anything to prevent or mitigate the loss does not appear. The steamer was the first vessel properly in the channel, and the schooner the overtaking vessel trying to get past. It will necessarily follow, therefore, that the decree of the court below must be reversed, but, in the taxation of costs, we do not consider that there should be taxed as legitimate costs in the case the taking and embodying in the record the vast amount of irrelevant and immaterial matter of examination and cross-examination of witnesses, swelling the record to nearly 200 printed pages, for which we cannot apportion the responsibility. It is therefore ordered that the case be remanded to the court below, with instructions to dismiss the libel, and tax the costs equally against the parties.